is Malak et al. versus BD Seidman, LLP. Mr. Collins. Thank you, Your Honor. May it please the Court, Todd Collins for appellants. I will respectfully reserve three minutes rebuttal if I may. Granted. Your Honors, this case involves a very narrow range of questions issue and exceptional facts. The very narrow issue, as you know, is whether reliance is presumed where a regulatory authority, in this case the SEC, would have prevented the offering. That is, would not have allowed the registration statements to go effective. Is that, is that you're saying? First of all, I can assure you the panel knows the facts and you spent half your brief on the facts, but I think the panel will be most interested in what you've characterized as the narrow issue. And part of that narrow issue, if I might broaden it a bit, is whether or not we should acknowledge the fraud created the market theory, which we have not done previously. I don't know that we've been called upon to do it, notwithstanding the fact that a few of the district courts in the Third Circuit have spoken to it, and the district court here assumed its applicability for purposes of the Rule 23 F appeal and classification motion before it. But what you just indicated with respect to the assumption of SEC approval sounds like, and I must be wrong, I must be right, a legal marketability theory, which is not what I thought you were proceeding on. But if you could, if you could indicate for us just what theory it is you do pursue in that the district court really addressed all three, or these two, with two subparts, the factual marketability and the economic marketability and the legal marketability as a subset of factual marketability. This probably fits most clearly within legal marketability. The Wiley case, Judge Lechner discussed this in the context of factual marketability versus economic marketability. Judge Choflat and his concurrence in the Ross case also discussed it in that context. But here we are talking about the fact that Judge Choflat discussed it, but he didn't embrace a position that would be congenial to the position you take. No, Your Honor. That's exactly right. He didn't. In fact, he rejected it. He did, indeed. Out of hand. Well, he did at great length. And he, of course, dissented in the Shores case itself. There are cases that go both ways. There are cases about the theory itself, that is, any one of those three applications, as the Court's well aware. There are cases that go both ways. All of the courts, all of the district courts in this circuit have embraced fraud created the market, at least in one form or another. The district court in its opinion suggested that the economic branch of the theory should apply. What I'm here today to suggest is on the facts of this particular case, not only is an appropriate standard to apply in this circuit, but in this particular case, the situation is so precise and so narrow and the facts are so unusual that whether we call it factual or whether we call it legal, this case applies. Whatever we call it, though, it seems that your position necessarily asks us to import principles of efficient market theory into the fraud created the market theory or cause of action. And at page 31 of your brief, you argue, since persons who buy securities in inefficient markets need protection from fraud as well as those who buy in efficient markets, some circuit courts as well as the district courts within the Third Circuit have adopted the fraud created the market presumption. Now, are you arguing that we should apply the fraud created the market theory simply because those who purchase securities in an inefficient market may be harmed, that they simply ought to have a remedy? It doesn't seem to, the argument doesn't seem to be founded on the economic theory that underlies BASIC and all of our jurisprudence that has followed it in fraud created the market cases. Your Honor, the presumption of fraud created the market is a presumption, but it is different from the fraud on the market presumption. In the BASIC case, the court pointed out that there are different circumstances in which reliance is presumed. And the court in the BASIC case cited specifically to the Affiliated Ute case with a situation with omissions, of course. The Affiliated Ute doesn't really have any application here, does it? And in fact, the district court, as I recall from its opinion, said you did not rely on it. Exactly right, Your Honor. My point is simply not that that applies or that Mills v. Electric Auto Light also cited by BASIC applies. My point instead is, to use the words of BASIC, where common sense and probability so indicate, then the presumption should apply, and this is a case. That's really what presumptions are about. Right. I mean, common sense and probability, human experience are why the law creates presumptions as essentially evidentiary shortcuts for the parties that invoke it. Exactly. What is the common sense and human experience that would argue for adoption of a fraud created the market theory, more particularly for the reliance, the presumption of reliance that you require here? Because fraud on the market applies in a sophisticated market where there is a history, where there has been a long series of transactions which have processed information upon which buyers and sellers may reasonably rely. That makes perfect sense in terms of practical experience, in terms of economic experience, in terms of business experience. What is it, however, in the primary market that suggests that such a reliance, that such a basis for reliance ought to obtain there, where there is none of the downstream information, the history of transactions, the analysts, the institutional investors, and so forth? Right. Well, that is exactly the point, Your Honor, and thank you for asking it. What this relates to is not the efficiency of the price, not reliance on the price as in fraud on the market, but instead reliance on the integrity of the market. Because the idea is that the market or of several very limited players who are fundamental to that primary market, whether it be an IPO or whatever it is. Right. Well, respectfully, I think that is one of the ways in which the district court got it wrong, because if we are going to call this legal marketability, the focus is, in this case, on the SEC and the impact of the fraud on the SEC's approval, and it is not on the promoters. What is to say that had the audit more correctly stated their discount rate and the prepayment rate than the default rate, and more properly compared it to others in the market, that the SEC would have said, you can't sell these things? Your Honor, the SEC is not, doesn't give a merits review. Exactly. The SEC doesn't approve, obviously. In fact, I believe it's a crime to state on a prospectus that the SEC does approve. Right. However, the SEC is very clear as to its requirements with respect to allowing registration statements to go effective. But they don't check it, as Judge Fischer has suggested. I'm sorry, Your Honor. The requisite is that an audit be supplied or filed with the SEC, right? I'm sorry, Your Honor. The requisite is that an audit be filed or supplied to the SEC. They're not going to double check it. It's part of the registration. The requirement is that in order for the registration statement to go effective, the consent from the auditor with respect to the use of the audits, the clean audits, or possibly the going concern audits, in this case clean, has to be included in the registration statement. What if the auditor had said in all candor, well, you know, the company here, the issuer is using a discount rate that may be lower than what the market among similar IOs that are being sold across this country would indicate. And in fact, they may be understating their default rate in comparison to similarly situated issues. But having said that, these are the issues which a buyer should be aware of, and this is indeed a risky investment which pays a high interest rate. Well, Your Honor, that is... Let's suppose that they said that. The SEC would have said, accepted, go ahead and sell. Certainly if that disclosure had been provided in the prospectus in the registration statement. You're right, Your Honor. I don't know whether it would have been the auditor or the company. Somebody. But yes, if that disclosure had been there, and this again respectfully is one area where I think the district court went wrong, it's not a matter here, as the district court said, that we're simply complaining about a particular risk that wasn't disclosed. It's not a question that the delinquency rates were improperly reported, as the district court suggested. That's just an additional risk. So maybe the bond was worth a little less than in fact was being sold for, the interest rate would be different. That's not the case we have here instead. It's a go, no go. You need for your prospectus, American business required for its prospectus, a statement that this was, that the financials accorded with GAAP and that the audit accorded with GAAS. And if it was impossible to provide that statement, that audit opinion, that consent to the inclusion of the audit opinion, then the SEC is very clear, no effectiveness. Now, I'm not sure what you're asking, what kind of rule you're asking us to adopt. It seems like on one hand, you're asking for a but-for rule under factual marketability, whereas the cases which have adopted the fraud, fraud creates the market theory, have said that there could be either an economic marketability theory or a legal on marketability theory. Yes. And you're asking for sort of a hybrid of that, which is another step. Well, we are asking for a decision very similar to what happened in Rainey and the Tenth Circuit, where an authority, in that case an issuing authority, had the opportunity to say yes or no to the offering going forward. But for fraud, it would have said no, exactly the same thing here. I do want to point out, if I may, please. Would you survive scrutiny under an economic marketability theory? We would not. I could argue, Your Honor, we might. It's a close call, but for purposes of this argument, we would not. Let me ask you this. Are you asking for a different on marketability theory than what appeared in most of the other cases that have adopted the fraud, created the market theory? I wouldn't say most. I would say, for example, Your Honor, that what we're asking for here is the same as Shor's, Rainey, Wiley. In all of those cases, there was the authority that had the authority to that allowed the offering to go forward that would not have been the case had the fraud been disclosed. So what would the rule be that you would ask us to adopt? Thank you. The rule applies specifically, obviously, in the class certification context. It applies in light of hydrogen, of course. The rule would be this. Where it is, where the district court can find by a preponderance of the evidence that the audit opinion was the product of fraud. So your fraud created the market theory for this case really, really hinges or focuses on the intent of BDO, doesn't it? Your factual theory. It hinges on the intent because this is a fraud case, but it could also be recklessness. In either event, Your Honor. Fraud or? Some measure of state of mind. Absolutely, Your Honor. Either intent or recklessness. And what the situation we're in now with the extraordinary facts, and forgive me, Your Honor, if I'm taking too long, but the situation that we're in now is we have a virtual admission from BDO on two critical things. One is, I rephrase that, we have a near admission that the SEC will not allow the registration statement to go effective. And then secondly, we have a near admission by BDO in the face of a very great amount of information that we put forward about the fraudulent nature of the audit. We have a near admission that that is so because they put forward no evidence whatsoever to refute it except for the broadest, well, we did what we thought was right. Was their audit fraudulent or sloppy? I'm sorry, Your Honor. Was that audit fraudulent or sloppy? Fraudulent, Your Honor. Under, it is, it meets the standards of this court. And you're saying they acknowledge that? We are at the, all they did was to not address any of the detailed factual allegations we put forth, as Your Honor, Judge Fischer pointed out, it was half a brief. I'm so sorry, Mr. Smith. I've taken my glasses off. I shouldn't have. I'm the good looking one. I apologize to the court. Somebody once did that on the Supreme Court. They addressed one of the justices by the wrong name. Did he win or lose, Your Honor? It depended who it was. It's an exceptional case and it's an exceptional case because of these admissions. It's also exceptional in the context of the hydrogen case because right now we need to show as plaintiffs by a preponderance that this fact is true, that this was a fraudulent audit. And we have received almost no refutation or the most general refutation from the other side, from BDO on that. On the strength of those two admissions. Could I pause right there? Please. Just for my own edification, explain to me how hydrogen peroxide has changed the way you need to go forward in the class certification proceeding. I've talked with district judges, as I'm sure probably all of you have, as to how the landscape has changed post-hydrogen peroxide. But I want to envision just how this plays out. Well, on plaintiff's side, Your Honor, I can assure you it didn't make life simpler. The district judges say the same thing. But what it means, as we understand it and what we believe we did in this case, is to prevail by a preponderance on all of the elements of Rule 23. And obviously, as hydrogen peroxide, as the Court's well aware, as hydrogen peroxide says, we need to prevail by a preponderance. And that's why we put together just an avalanche of information here with regard to the specific ways in which there was a violation of auditing standards and also a gap in connection with these financial opinions and also in the audits. All right. Thank you. Mr. Collins, we'll have you back on rebuttal. Mr. Hoefner? Hoefner. Good morning, Your Honors. Timothy Hoefner on behalf of BDO Seidman, LLP. Since we've now focused on the issue of legal unmarketability, I'll go to that. Again, I think Judge O'Neill did a tremendous job of reconciling the economic marketability and the factual marketability pieces in the different tests and, in fact, focused on the language in Wiley, identifying that Shores, in every other case, has required there to be a sham, a hoax for a business, a worthless entity. So under those two tests, clearly they don't satisfy the standard that's used in most cases in the Eastern District of Pennsylvania, in the Wiley case, and in any of the other cases, frankly. With respect to legal marketability, they're clearly seeking to misapply the legal marketability test. The Tenth Circuit opinion in T.J. Rainey is very, very different. There, the Court held that the securities were not qualified legally to be issued. The issuer entity there was adjudicated in a separate proceeding to be an invalid public trust. That case demonstrates the limited applicability of the exception, since the issuer was found not to be a valid trust and was, quote, thus prohibited from issuing any bonds by Oklahoma law. Thus as Judge O'Neill explained, legal unmarketability occurs when a regulatory or municipal agency would have been required by law to prevent or forbid the issuance of the security. This is a very different case. The appellants have failed to demonstrate by a preponderance of the evidence that ABFS was not a legitimate lending business that should have been shut down by state regulators. Indeed, the speculation about what might have happened if BDO did something different is contradicted by the extensive discovery record in the case. And I think the best example of that is found at A113 in the record, which is an email from Ari Gabonet, who is the District Administrator for the SEC in Philadelphia. Is that email? What about the Deborah Nager testimony? And although her name wasn't invoked, I believe that was some of the evidence that Mr. Collins was referring to toward the end of his presentation. She testified during deposition, as I recall, to the effect that the notes never would have made it onto the market, but for the BDO audit opinion, didn't she? I was going to get to that, and it's a good question, and it goes to the core of the theory that they're trying to articulate, which is they're trying to create a new theory, which is based, which I would call defendant's compliance with the law created in the market. Does the theory that the plaintiffs have espoused have a source in any other Court of Appeals decision that you know of? I can give you a little bit of... And by that, I mean the explicit test that Mr. Collins gave me in response to my request for a rule. That's a good question. Let me just start by saying it hasn't been accepted by any case, and it shouldn't be accepted by any case, because all he's saying is that the company complied with the law, with the federal securities laws. The federal securities laws require the inclusion of audited financial statements in a registration statement. The federal securities laws require officers and directors to sign the registration statement. If the test that they're suggesting is true, you would have no reliance element. You would be collapsing the concept of a material misstatement into the concept of reliance. You can't satisfy that test just by showing that the company complied with the law by getting audited financial statements and getting signatures from directors and officers. If his test is true, you could just sue directors and officers, and you could sue auditors in any case where a registration statement was filed in accordance with law, and then it turned out that there were false statements in that misstatement. That's just not the law. That has not been accepted in the cases applying the fraud created the market theory. Now going back to your question, Judge Smith, there was... This is really a variation of discredited reliance on the regulatory process theory that was articulated by the Ninth Circuit prior to BASIC in the Arthur Young case, which is cited in Judge O'Neill's opinion and in our brief. That case suggested that a filing with the SEC was sufficient to satisfy the reliance element. But the Joseph versus Wiles opinion, in addition to Judge O'Neill's opinion, expressed very clearly that the problem with this presumption of reliance is that it appears to create a form of investor's insurance, expanding the SEC's role beyond its intended or realistic scope. And then Eckstein, which is one of the Circuit Court opinions... It's Judge Easterbrook's opinion. Exactly. You know, again, refocuses that by saying that federal securities law does not include, quote, merit regulation, meaning that the law does not pass on the merits or risk of an investment. And this all goes back to the email from Ari Gabine, which I think really tells the story better than anything else, when he says, we talked to them endlessly, reviewed their documents, met with their auditors. Jack, who was in corporate finance, worried over their discount rate assumptions. We all hate the gain on sale accounting, but we never found anything we could say was false and misleading. And he goes on, as long as we have a disclosure and not merit-based system of securities regulation, I don't feel there's a lot I can do. A lot of folks made a lot of money for a lot of years on these things. People bought them in the pursuit of above-market returns and took disclosed above-market risks. One of those disclosed risks, the inability to issue new notes, became a reality. There is no test that adopts what they are saying. He tries to refocus the issue on the element of a misstatement, an alleged misstatement. He focuses on BDO's audits. We don't adopt anything that he says. We vehemently disagree with the concept that BDO did not perform audits in accordance with generally accepted auditing standards. But that's not an issue that's relevant to today's argument. That is an issue that's relevant to whether there was a material misstatement made, whether there's c-enter. Those are issues for a summary judgment motion. I think, again, going back to T.J. Rainey, and then I just want to point out one other fact on Wiley before I move on to another issue that you raised, is the Wiley case, again, which is the other significant case that touches on this legal marketability, is extremely different. That was a case where there were criminal pleas for violations of the federal securities laws. The SEC stepped in and obtained a stop order halting the sale of the securities at issue. That case, like what happens, you're not focusing on speculation that exists in a case about what the government might have done if the facts were different. And this all goes back to the hydrogen peroxide standard, which says that appellants have a burden to show by a preponderance of the evidence each of the elements to satisfy class certification. They have not done that. Unlike those cases where you had actual proof, you had actual facts, they are speculating about what might have happened, which is directly contradicted by the Gabinet email. So from an evidentiary standpoint, under hydrogen peroxide, which does create a higher standard and makes it easier for a court to deny class certification. A higher evidentiary standard. A higher, creates a higher evidentiary standard at the class certification stage and makes it easier for a court to focus on the merits issues in addressing class certification issues. But here, they have not satisfied that standard in hydrogen peroxide. They have not presented evidence to satisfy that standard. For purposes of showing predominance under B3, is that? Yes, sir. Is that? And again, it's all based on, they're speculating. This might have happened, this would have happened. But all they have proved, and all the Debbie Nager testimony proves, going back to your point, is that the company complied with law. The SEC rules say you need to have an audited financial statement. It's nothing else. It doesn't get you over the hurdle. Their proposed test, as articulated in response to Judge Smith's question, and as argued in their brief, it seems to me to be a proposed but-for test. And haven't they met that? Haven't they met their proposed test? If their test is but-for the compliance with the law... Let's assume for a moment that's their test, a factual unmarketability theory. If that's their test, haven't they met at least that test? Now, leave for a second whether that's the right test. But if that's their test, haven't they met that? If their test is but-for compliance with the law, the registration, the notes would not have been issued. Yes, they would satisfy that test. What I'm saying is no court has ever adopted that test. Why shouldn't we, the fact that no court has adopted that test, why shouldn't we apply that test in this case? The Supreme Court has not said we can't adopt this kind of test. And this is a, you know, this is a little different factual scenario than you have in other cases. So why shouldn't we apply it? It's a good question. The answer is yes, the Supreme Court has said that you can adopt that test in BASIC because BASIC has said that reliance is an element of a section 10b-5 case. But their test would give a presumed reliance, which is similar to the presumed reliance that the Supreme Court has approved in the sale of marketable securities. Again, one, this is, as BASIC recognized, this is a very different situation. BASIC said when you're involved in face-to-face type transactions, you don't have these types of presumptions. That's why the fraud in the market theory was focused on an efficient market. Secondly, if you adopt that test, there will be no reliance anymore because in every situation, companies comply with the law, directors sign registration statements, auditors include their auditors, involving a registration statement filed with the SEC where they would not be able to establish this fraud created the market theory. There is no precedent to support that. I think it flies in the face of the BASIC opinion. I think it flies directly in the face of the Stonebridge opinion, the recent Stonebridge opinion from the U.S. Supreme Court, which certainly pulled back on the concept of expanding private rights of action under section 10b-5. Stonebridge is an example of a case where the Supreme Court's basically saying, well, you know, we may have gone a little bit too far down the line beyond where Congress said we should go, and we just hope nobody goes much further. And again, I think Stonebridge also recognized only two exceptions to the reliance element, the fraud in the market theory and the affiliated presumption. As I understand it, you can file a registry, and I remember reading an article years ago, which I found very amusing, and it pointed out some of the statements that were filed made it absolutely clear that what was being registered was garbage, but it was registered and sold. And you can do that, can't you? In other words, if you're honest, it doesn't make any – if you disclose what you're supposed to disclose, even though people should run for their lives, you're not liable. Well, let's take that back to what was disclosed here and why, in this case, it wouldn't make sense to say that the many people who didn't read this should be permitted to go forward with a class action. This is not a situation where disclosures were buried in the disclosure document about the risks that were faced by people. Page 1 of the registration statement said, quote, ABFS incurred losses of $29.9 million and $26.3 million for 2003 and 2004. Page 1 said, an investment in these securities is highly speculative and involves a high degree of risk. Page 1 of the prospectus and registration statement said, quote, you should only invest in these securities if you can afford to lose your entire investment. So the scenario that you're proposing occurred here, and it really demonstrates why it would be ludicrous to permit a class to go forward – In other words, reading somebody actually read that, they should run for their life. And one of the proposed class members actually said if he did read it, he wouldn't have And criticizing the fraud created the market theory emphasized that creating an incentive to disregard the written materials that support an offering is illogical, particularly in a situation where you know there's no efficient market, where you know that the people at the company who have an incentive to maximize the price for the offering and to get the offering done are controlling that decision whether to go to market. This is the very situation where they should have looked at the financial statements and all they had to do was look at page 1 and they would have seen what was there. And that's what they disregarded, and that's why, yes, in some senses this is a unique case because the disclosures were there and you have so many people who didn't read the financial statements. Did the record in this case say anything about the size of the investments? And I say that because sometimes you have class actions where the actual individual losses are very, very small, you know, $50, $100. Do we know what's involved here as to a particular individual? Yes. It can't be that small. Two things. One, going back to the hydrogen peroxide standard, there's no expert coming in here who's done a full analysis and has talked to that specific issue. There's – and there really is no evidence to support anything with respect to the issue of what the size was of the investments or anything. I don't know that. There's bits and pieces of random stuff in the 70 deposition days from the trustees' litigation, but there is no real evidentiary record looking at the class as a – the proposed class as a whole. I'm in the red if I just may – No, Mr. Hoffman, let me ask you one other question. Yes, sir. Do you think that since we have never adopted the fraud-created-in-the-market theory, do you think we should reject that theory? One, I don't think you have to. I think – I think, again, Judge O'Neill put a fabulous job – That wasn't the question. We know that. And – but the answer is yes. I think for the reasons that are expressed in Eckstein, I think for the reasons that I articulated with respect to Stonebridge, and just one final point. Within the last two weeks, there have been three decisions issued by district courts in the Southern District of New York and in the Eastern District of California. Since I just learned about them yesterday, I did not submit those. I'm happy to submit a letter to the court to attach those three opinions, but Abu Dhabi Commercial Bank v. Morgan Stanley from the Southern District of New York is a Judge Shinlin opinion, which – In Re UBS, auction rate securities, also from the Southern District of New York, and George v. California Infrastructure and Economic Development Bank, which both confirm that the Second and Ninth Circuits have not adopted the fraud-created-the-market theory, and also are very critical and expand on the reasons articulated by Eckstein in Eckstein and also use the Stonebridge opinion to basically show how that limited the presumptions that are afforded under Section 10B to the two different scenarios of the fraud on the market and affiliated ute, and how that suggests that you shouldn't go any further, how the Supreme Court has not adopted or suggested that there is any further presumption that should be afforded. If we reject the fraud-created-the-market theory, then at that point we just affirm, right? I think that would be – Yes, sir. But you say we don't have to reject that theory, and what's your alternative? Again, I think – I mean, if you look at the – Stinson was just affirmed memorandum, which is the easy way. I think the – Easy way is what? To affirm by memorandum. I think that the opinion in Ackerman in the Sixth Circuit affirmed and criticized quite heavily the fraud-created-the-market theory, but then said also that in that case they had not satisfied the standard. But of course, absent a ruling in which we would either adopt some form of fraud-created-the-market or reject it outright, district courts within the Third Circuit will continue, as the district court did here, having to make assumptions, and in this case went through a very well-written and a very detailed opinion, considering three different applications, three different forms of un-marketability, whereas with a pronouncement from us, one way or another, certainly district courts themselves would have some guidance they lack at the present time. Yes, Your Honor. Absolutely. Clarity is always a good thing, and obviously we have three theories that are hanging out there. Mr. Collins is suggesting a fourth, and obviously an opinion that clarifies that issue. I would go back to the – For you, a win is a win, I understand. I will absolutely give you that admission in three seconds, but it just – if I may just touch on it, because you asked really what should be the standard. And I think, you know, if you do adopt fraud-created-the-market, I think, again, the standards that were applied by the courts in this case – I think Gruber was exceptional, again, focusing on sham or worthless enterprises, which I think really is consistent with Wiley, which, again, the to undermine its genuineness and render it unworthy of trading, and talked about no legitimate business purpose. You're basically saying you could live with limiting it to a legal unmarketability theory. Yes, I could. Obviously, my primary interest is to get an affirmance. Beside the affirmance. But you asked me the question, should the court adopt it? And I think the confusion that's been out there in terms of what a theory is, I think the difficulties in trying to apply a fraud-created-the-market theory, I think, you know, anything that goes beyond the sham hoax, which is talked about in Wiley, the worthless entity, I think is really creating more problems and opening up holes and really is a direct affront on BASIC, on Stonebridge, and on Central Bank in terms of the efforts to limit causes of to affirm that reliance is a real element of a Section 10B cause of action. And it'll avoid these kind of situations where someone comes in and says your compliance with law is enough to get us past the reliance element. That's a travesty, and that would be horrible both for this case and for any other case before this court or any district court in this circuit. Thank you very much, Mr. Hopkins. Thank you, Your Honor. Mr. Collins, rebuttal. Mr. Collins, you heard invoked in the argument presented by Mr. Hoefner or actually in questions the panel has asked Stonebridge, and I'm interested in hearing your view solely for our interpretive purposes. Would you agree that the Supreme Court and I suppose even Congress with the PSLRA has seemed to instruct us or suggest to us a narrowing of 10B liability? And if that's the case, if that's the assumption, why should we credit a new theory providing for a presumption of reliance that would enable more 10B action? Well, Your Honor, first of all, I don't think this theory is new. Secondly, I'm not sure that... It is for the Third Circuit if we were to adopt it. Yes, Your Honor. It is, of course, true as we've argued that all 10 courts that have considered it at the district court level have embraced it or talked about it in a favorable light. I guess what I would suggest here, though, is that it's not... Nobody has rewritten the securities laws yet. Stonebridge said a lot of things, but most of what Stonebridge said was not relevant to this case. It was a situation, as the Court's aware, where the Supreme Court said that someone who does not speak to the market cannot be held liable. No question here but for the fact that this defendant, BDO, spoke to the market, so Stonebridge really doesn't apply. In terms of narrowing the law, Your Honor, I don't know. But in terms of maintaining the law and not expanding it, I think that's a fair conclusion. But this respectfully, despite Mr. Hoffner's argument, does not expand the law. It doesn't because the same thing happened in the Shores case. The same thing happened in Shores. The Court, which was the authority which said no to the offering, this authority, this public authority, if they had known about the scheme, they would never have allowed the bonds to issue. That's not new law. That's Shores. In the Wiley case, there were a lot of bad things going on in the Wiley case. They didn't have to decide the case on this basis. But the Court did say that if the fraud had been disclosed, the SEC would have prevented the registration statement from becoming effective. Again, respectfully, very narrow. We're talking about an audit opinion that was fraudulent as to which at the hydrogen class certification stage, we've heard essentially no denial that it was fraudulent. This isn't opening the floodgates in the basic case as well. You will recall this same argument was brought forward and rejected by the Court that this is going to read the reliance requirement out of the securities laws. It isn't the case. Thank you very much. Thank you so much. Thank both the counsel for an extremely well-argued case, a very interesting case. I would direct that a transcript be prepared and ask counsel if they would arrange through the clerk's office for sharing of the cost of the transcript of this argument. We'll take the case under advisement. Thank you very much. Your Honor, should we, should we, is, are we, may we?